```
                  UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK

In re:                              :
                                        Docket #16cr289
 UNITED STATES OF AMERICA,           :

                    Plaintiff,       :

   - against -                       :

 BIBA KAJTAZI,                       :
                                        New York, New York
                    Defendant.       : May 23, 2016

------------------------------------ :


                     PROCEEDINGS BEFORE
               THE HONORABLE GABRIEL GORENSTEIN,
           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE


APPEARANCES:

For Plaintiff:          U.S. ATTORNEY'S OFFICE
                        BY:  DREW JOHNSON-SKINNER, ESQ.
                        One Saint Andrew's Plaza
                        New York, New York 10007


For Defendant:          ANTHONY SUAREZ, ESQ.
                        517 W. Colonial Drive
                        Orlando, Florida 32804




Transcription Service:  Carole Ludwig, Transcription Services
                        141 East Third Street #3E
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Fax:  (212) 420-6007

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service
```

## <u>INDEX</u>

### <u>E X A M I N A T I O N S</u>

| <u>Witness</u> | <u>Direct</u> | <u>Cross</u> | <u>Re-<br>Direct</u> | <u>Re-<br>Cross</u> |
|---|---|---|---|---|

None

### <u>E X H I B I T S</u>

| <u>Exhibit<br>Number</u> | <u>Description</u> | <u>ID</u> | <u>In</u> | <u>Voir<br>Dire</u> |
|---|---|---|---|---|

None

THE CLERK:  U.S. v. Biba Kajtazi.  Counsel, please state your name for the record.

MR. DREW JOHNSON-SKINNER:  Good afternoon, Your Honor, Drew Johnson-Skinner for the Government.

MR. ANTHONY SUAREZ:  Good afternoon, Your Honor, Anthony Suarez on behalf of Mr. Kajtazi.

THE COURT:  All right, we're here for a detention hearing, and I'll hear from the Government.

MR. JOHNSON-SKINNER:  Good afternoon, Your Honor. The defendant was arrested on April 23 in the Middle District of Florida.  He was presented on April 25.  He arrived in this District and was presented on May 17, at which time he consented to detention without prejudice. Judge Carter has referred this matter to this Court today.

The defendant's charged in an indictment with conspiring to distribute five kilograms and more of cocaine.  It carries a mandatory minimum sentence of ten years and a maximum of life.  Given his prior felony drug conviction, he could face a mandatory minimum of 20 years. Because of that serious narcotics trafficking charge, there's a rebuttable presumption that detention's appropriate in this case, and he won't be able to overcome that presumption.

First, let me start with the evidence in this

case.

THE COURT:   Before you talk about the evidence, I was handed a pile of line sheets which I have not looked at, so I don't know if anyone expected me to read them. But if they did, I haven't.

MR. JOHNSON-SKINNER:   Understood.

THE COURT:   You'd need to point out whatever it is – I assume there's no letter that accompanied them.

MR. JOHNSON-SKINNER:   No, Your Honor.   I only intent to reference them and didn't expect that you read them.

THE COURT:   And I assume there's been no complaint in this case.

MR. JOHNSON-SKINNER:   No, Your Honor, just an indictment.

THE COURT:   All right, so I have no information about what happened.   Go ahead.

MR. JOHNSON-SKINNER:   The evidence is extremely strong as to this defendant.   He conspired with, among others, Kustrum Demaj (phonetic) who's also charged in the indictment to import cocaine into the United States from Colombia.   There was wiretaps on this defendant's phone along with Kustrum Demaj's phone.   They revealed the defendant talking with Demaj about importing that cocaine

through commercial plane flights and attempting to import

it through package shipments.

      THE COURT:  Through?

      MR. JOHNSON-SKINNER:  Through shipments of

packages through DHL.  There will be cooperating witness

testimony that Kustrum Demaj accepted an order for a

kilogram of cocaine and was provided money, cash for that

cocaine, and that he was coordinating that shipment of

cocaine through this defendant.

      There are travel records for this defendant that

show that he traveled to Colombia at least four times,

including right before some of these wiretap calls in

February 2016.  These wiretap calls take place where this

defendant is in Colombia talking to Demaj here in the

United States about the cocaine.

      Among other things, there are calls on the second

page of that packet labeled 3 of 25 where Demaj asks this

defendant --

      THE COURT:  Hold on, hold on.

      MR. JOHNSON-SKINNER:  Sure, Your Honor.

      (pause in proceeding)

      THE COURT:  I don't have anything – you're

talking about the lower right?

      MR. JOHNSON-SKINNER:  Yeah.

THE COURT:  I have 2 of 25.

MR. JOHNSON-SKINNER:   The next page, 3 of 25?

THE COURT:   Oh, I'm sorry, I didn't look at the next page.  Got it, go ahead.

MR. JOHNSON-SKINNER:   That's a February 12, 2016 call.  The defendant's still in the United States at that point, and Kustrum Demaj asks him, "Did you create your ticket," in the middle of that page, and he says, "Well, I made it a while ago," and Kustrum says, "Because I just wanna show, I wanted to show him, you know, but not the name, the details of when you're going."  And then later down Demaj says, at the end of the longer paragraph there, "I wanted to take that from him, I wanted to get that money from him."  He's referring to getting money from his cocaine purchaser.  He wants to show that person that this defendant is, in fact, going to Colombia to get that cocaine.

There are further calls.  There's a February 24, 2016 call.  That's labeled at the bottom page 7 of 11.

THE COURT:   Okay.

MR. JOHNSON-SKINNER:   In that call Demaj says, in the middle of the page, "My man, since he's paid up, he paid the money, so now he asks what's happened, what's going on, and I told him these things take time."  And in

this case Demaj and this defendant are talking about the
fact that nothing's happened yet.  This is February 24,
2016.  At this point, the defendant is in Colombia trying
to get that cocaine.

The next day, February 25, 2016, this is
approximately ten pages later in the line sheet that's
labeled at the bottom 9 of 19.  It's a call that occurs on
February 25, 106 --

THE COURT:  Hold on, hold on.  Go ahead.

MR. JOHNSON-SKINNER:  In this call the defendant
called Kustrum from Colombia and says, "Yo, at 12 it
departed, at 5:20 it arrives."  He's talking about a plane
flight that will contain the cocaine.  And later in the
call this defendant says, "Check them out now.  Okay, two
are inside now, two."  He's referring to two kilograms of
cocaine that are supposed to be inside the luggage that
will be onboard that commercial plane flight.

But the luggage doesn't end up getting sent.
There's a later call, same day, 15 of 19 labeled at the
bottom right --

THE COURT:  Hold on, hold on --

MR. JOHNSON-SKINNER:  -- about three or four
pages.

THE COURT:  Go ahead.

MR. JOHNSON-SKINNER:   And that's also February 25, 2016 between Kustrum Demaj and Biba Kajtazi, and Kustrum says, "Nothing has come out from inside so far." So the suitcase didn't arrive.  "There's a chance he has lied to you and hasn't sent anything."  He's talking this defendant's contact in Colombia that would be able to provide the cocaine.  And it's clear that they're talking about illegal drugs because at the end Kustrum says, "Checked and checked and there's nothing at all.  Talk to him and find out for sure, if they sent it for sure, or maybe they caught it there," referring to authorities in Colombia who could've caught the cocaine at the border.

There's a later call on February 26, 2016.  This one is in a little bit of a different font, it's labeled 2 at the top right of the page.

THE COURT:   Yep.

MR. JOHNSON-SKINNER:   And Kajtazi there explains that the one that was supposed to send out the cocaine, he didn't do it, didn't get them out.  So that's why it didn't arrive.  So he's gonna try tomorrow or if not tomorrow, maybe he can get his money back.  And lastly, as part of that same call, on page 5 at the top, defendant and Kustrum have a conversation about additional drugs.  Kustrum asks where are they, and Biba says, "No, no, they're where the

sun rises, down there, down there." The Government believes that a reference to Miami. And Biba's talking about a person who can get him additional drugs for 15 or for 17. We believe that's for $15,000 or $17,000. "He gives us four." We believe that's four kilograms of drugs. And Kustrum says, "Two are ours and two are his because he wants to go as partners in that drug deal."

So all of these calls, plus the cooperating witness testimony, make plain the evidence --

THE COURT: I'm sorry, did you tell me what the cooperating witness testimony is?

MR. JOHNSON-SKINNER: It would be, Your Honor, that Kustrum Demaj, the person he's talking to in this call, just before the defendant left for Colombia, had accepted a purchase order for a kilogram of cocaine, had received cash, thousands of dollars in U.S. cash in exchange for that cocaine, and intended to send this defendant to Colombia to do that, and, in fact, did. Kustrum Demaj asked this defendant for his plane tickets so that he could show another person that this defendant was, in fact, going to Colombia, and they were serious about him going there to get drugs.

There's also travel records showing this defendant, in fact, went to Colombia for that purpose. All

of that shows that the evidence against him is exceptionally strong.  He faces the mandatory minimum of ten years' sentence, maximum sentence of life.  All of that provides an incentive to flee.  In fact, the defendant has a history of international travel, reported to Pretrial Services that he traveled to Italy, among other countries. Most importantly, he traveled to Colombia at least four times as part of this case.  There's wiretap evidence that the defendant has a girlfriend in Colombia and that that girlfriend is pregnant with the defendant's child, providing a serious incentive for him to flee to Colombia.

Defense counsel before this proceeding informed me that the defendant had attempted to get permission for the girlfriend to come to the United States to have the baby here in the United States, but that permission was denied, which provides him only more incentive to go to Colombia.

Additionally, the defendant's rap sheet shows that he has a conviction, an arrest in 1995 and a conviction in 1997 for distributing drugs.  He received a sentence of ten years in jail on that, and he was charged in that case with obtaining illegal drugs through using a false ID.  His rap sheet shows that he used a false ID.  It's in the name of Robert Cruz.  We understand from that prior case that he used that name to import drugs into the United States.

That's evidence that the defendant knows how to get false

ID's, has used false ID's in the past.  The Court can't

have trust that it's going to be able to find the defendant

if he is released on bail.

Additionally, he has a January 2016 arrest for

criminal contempt.  It says failure to obey a court order.

We understand that that is in connection with a bar that

the defendant ran.  A court had told him the bar has to be

closed.  There was an injunction against the bar because it

was selling to underage people.  Defendant apparently

ignored that order, kept selling alcohol there.  That's

what that criminal contempt arrest is about.  Not as

serious as these charges, but it shows that he has no

respect for the order of a court in a much less serious

matter, and can't be trusted to be supervised on release in

this case.

So for all those reasons, the defendant is a

serious risk of flight, can't be relied upon to be under

court supervision.  He's also a danger to the community

distributing cocaine, especially the amount of cocaine he

wanted to import, the other people he worked with to import

cocaine poses a danger to the community.  His criminal

history shows that this isn't the first time he's done this

and that his prior ten-year sentence wasn't enough to stop

him from doing it this time. So for all those reasons we think he won't be able to overcome the presumption and he should be detained.

THE COURT: Was Demaj arrested at the same time?

MR. JOHNSON-SKINNER: He wasn't, Your Honor --

THE COURT: Kustrum Demaj.

MR. JOHNSON-SKINNER: Not exactly the same time. He was arrested in New York, and the case has been assigned to Judge Carter.

THE COURT: Okay. All right, Mr. Suarez.

MR. SUAREZ: Good afternoon, Your Honor. First, we point out to the Court that of the four defendants my client is number two. All these defendants are out of jail except for my client. Let me address, first, the question of roots in the community, and I'll deal with the question of the strength of the Government's case and the collateral that I think I'd like to put forth.

First, my client's roots in the United States are extreme. In the Bronx in particular, his entire family lives here. His parents, and one who sits here, his mother who is sitting here, lives at 585 East 189th Street in the Bronx. Not only does she live there with her husband, who cannot be here with us today because he suffers from severe diabetes. He had amputation of his foot, and he's

connected to tubes, and so he cannot be present before this

Court. But between the two of them, who now live in the

same building as does two brothers of Mr. Kajtazi and Mr.

Kajtazi himself, four families live in this one building in

the Bronx. He has six brothers and sisters, all of which

live in the Bronx, all of which within a stone's throw of

each other. His roots are extremely tight. I'll go with

that in a minute.

But his parents own not only the building, which I

have given to the U.S. Attorney's Office an appraisal of

$1.3 to $1.5 million as an asset of the family. All four

families live there. Beside that, they own a restaurant

called Tony and Tina's Pizzeria at 2483 Arthur Avenue in

the Bronx. They own Paulina's Food Market and Deli at 2479

Arthur Avenue in the Bronx.

As I indicated to the Court, my client's father is

very ill, and he attentive to his father and cares for his

father. If he were to flee, whatever bail we put up, it

would risk having these families' assets be tarnished.

He has brothers and sisters. Today here I believe

his brother Philip is here who lives apartment 1. He has

two nieces and nephews here in the Bronx. Simon Kajtazi I

know is here, Simon is here, and he has, he also lives at

585 East 189th Street in apartment 2. He has two children,

therefore, two more nephews of my client. By the way, he
also, Simon owns a business right around the corner from
Arthur Avenue, restaurants, which is additional tie, is a
bar and grill in that location.

My client has a sister Antonetti Kajtazi who lives
in the Bronx, has two children, two more nephews; a sister
named Carmen Gorzola who was one child, age 20, lives in
the Bronx as well. Nina Patuola (phonetic), I hope I
pronounce that correctly, but she is, has three children
which are three more nephews of my client, that lives in
Pelham Parkway in the Bronx. And Josephine Patuola, who's
here, Josephine is here, all right, and she's a sister who
lives in Mahopac, the only one that got outta the Bronx,
but she's also a New York native, and they're all New York
citizens. Plus my client himself is a United States
citizen.

Besides these roots in the community, my client is
married, his wife is here. Elizabeth, please. Okay.
Elizabeth, they've been married for 23 years. They live,
him and his sons, they have three children, 20, 19, and 8
years old, that live in the Bronx at 585 East 189th Street,
apartment number 4 of that building that I just mentioned
to you. He also has a child of age 25 from a previous
marriage which is also living in New York City. So his

roots are extremely strong.

His wife, Elizabeth, owns a restaurant called Michelangelo's Brick Oven Restaurant in Bronx, New York, and it is a business they owned since 2009. It's about 5,000 square feet. I don't know how many people sit in there. I've been there now twice, and it's a very large, very prosperous actually business. Beside that restaurant, Michelangelo's, they own a Howl at the Moon. It's a bar restaurant they've owned since 2007. It's a family business. And Elizabeth is very industrious, she also has a real estate management company that she has at 584 East 189th Street in the Bronx.

Beside all these things, Judge, my client has two children that are getting married soon. Nicolette is getting married July 30, and his son Nicky Kajtazi is getting married in August of this year, all of which he has all the intentions of participating with.

Now, let me talk about this risk of flight that the prosecution seems to have brought up to the Court's attention. It is true, and it is embarrassing, but it is not a crime, my client had a girlfriend in Colombia, which he met here in the United States. It's not like he went to Colombia and having met her. He met her here, and an affair developed which was causing him to go to Colombia.

He wasn't going to Colombia for drug deals. That's very open conclusions by the prosecution that he was going there for cocaine because there's no evidence whatsoever, which I'll get to in my latter part.

But he had a reason to go to Colombia because he was, had a girlfriend who ended up by getting pregnant, and that because she was pregnant, he was trying to bring her here. Now let's talk a little bit about this girlfriend that seems to be the reason why the prosecutor believes he a flee, that he will flee to Colombia. In fact, that young lady is an American resident alien, and I have a copy, and I showed the copy of the resident alien documentation to the prosecutor. So she has all the legal reasons – she can be legally here in the United States.

But not only were they not thinking of going to Colombia to live, which is totally opposite, the actual truth is she was coming here because she has a New York State driver license, which I've also shown to the prosecution. So she applied for her driver's license to make her stay here more permanent.

If my client was thinking of going to Colombia, why would he then apply for the parents of this young lady to have visas to come, and in their letter, in the letter that he wrote to immigration authorities granting them

visitors visas, he writes that they want to come here to
have their daughter, witness their daughter give birth to
their child, which will be in New York, a copy of which
I've given to the prosecution as well.

So, in fact, the risk of flight is totally
reversed.  Everything was to try to bring this young lady
to the United States, not for him to be going and trying to
reestablish a new life after having all the assets and
family he has here.  He's not a risk of flight whatsoever.

And so this young lady has a social security
number, American social security number.  She's got a
driver's license, and she's all the indicia that she's
gonna be here, and he would have no reason whatsoever to go
to Colombia.

Now, Your Honor, I'd like to address the question
of the prior history which is also addressed.  One of the
things that was not mentioned that 20 years ago, when my
client was convicted of the offense of drugs, he was out on
bail in that case after he was, after he pled and before he
was sentenced for 15 months knowing that he was going to
get a ten-year sentence.  He came back.  He didn't flee
then and certainly would not flee now when he has much more
assets and much more loot to lose than when he did 20 years
ago.  That shows a commitment to the process and

willingness to come back to this court.

Now, Your Honor, let me then address the case, of the strength of this case. I was handed moment ago, before this hearing, the transcripts which this Court was looking at. And being experienced at looking at transcripts, I was looking for the conversations about the weight, or secret coded – nothing that I saw in those taperecordings indicated any talking about weight, they didn't talk about dollars, they didn't talk about any, at all. In fact, Mr. Kustrum, number one on the indictment, who it seems to indicate he is their informant, they had business deals together. He sells cars and buys cars. In fact, there's reference to in some of the other conversations, I have some cars, I'm going to the auction, I'm gonna pick them up, which is what their normal business. They have restaurants, they exchange business. This is normal conversation between my client and Mr. Kustrum.

So nothing on those taperecordings indicated to me any kind of conversation about cocaine. There is nothing about weight, there's nothing about numbers, nothing about sticks, nothing about shoes, nothing about any kind of indication which is typical of narcotics.

And then, Your Honor, I've looked at the indictment. Unless something else comes up, this is a one-

count indictment, charging conspiracy, no substantive

because all of the dissertation just given us by the U.S.

Attorney's Office, they never mention that my client had

any drugs or he was in possession of anything or that they

caught him in possession of anything. Where's the beef?

Where's the case? It's a conversation to be interpreted?

I recommend – my indication actually this is quite

a (indiscernible) case, and I say to this Court, my

recommendation to this Court is that bail should be set at

no more than $250,000 and can be secured by his mother and

his wife. They have collateral if the Court should require

some collateral, the building itself. And so I think that

that is more than enough to keep this man coming back and

forth to this court. Thank you.

MR. JOHNSON-SKINNER: Just a couple of points,

Your Honor. The defense counsel mentioned at the beginning

that the other defendants in this case were on bail.

That's primarily because they don't have a history of

traveling to Colombia, a girlfriend who's pregnant with a

child in Colombia, not to mention the assets that this

defendant has to flee, in addition to his own drug

trafficking criminal record.

THE COURT: I'm sorry, assets, you're referring

to?

MR. JOHNSON-SKINNER:   The defendant reported in the Pretrial report that he has $80,000 in his checking account, $5,000 in his savings account.  So it's not like the defendant has no money to use if he wanted to leave the country.

The defendant mentioned, defense counsel mentioned the defendant's family in the Bronx, including nieces and nephews.  What's more important is the fact that he has a girlfriend in Colombia who he has a child with.  That provides an incentive for him to leave the United States and go there.  Her application for coming to the United States, despite the driver's license and this other resident card, apparently was denied.  So it's not like, to my understanding, she's free to come here.

The defendant also, it's not the case that the calls don't discuss weight.  We pointed out to the Court calls where the defendant said there should be two in the suitcase, that's two kilograms of drugs.  Other calls are about four, two are for me, two are for you.  That's four kilograms of drugs.  The defendant, frankly, didn't have to have detailed conversation on the wire with Kustrum Demaj because he was here in the United States and could talk to Demaj in person about this drug deal, knew why he was going to Colombia, and came back to the United States during the

pendency of this attempted transaction.

So it's not surprising that they didn't have to discuss in detail on these calls the details of the transaction. Further, there are wire calls that suggest that this defendant and Demaj got phones, separate phones, particularly for the carrying through of this transaction. They knew that the Government intercepts calls. They were sensitive to that, and got separate phones so that those calls wouldn't be intercepted. In fact, when the defendant was arrested, he had on him not only the phone that we intercepted, but he had a blackberry phone which is commonly used by defendants in these cases because they think they can't be intercepted or traced. And that may well have been the other phone the defendant got just for the purpose of his trip to Colombia.

In fact, there's a wire call where this defendant calls Kustrum Demaj and says I've been trying you on the other one two or three times, I tried you on the other one. Now I've called you on this line, which happened to be intercepted. So the evidence is very strong there's a drug deal going on here in this case, and for those reasons the defendant should be detained.

THE COURT: Anything you want to add?

MR. SUAREZ: No, Your Honor, I indicate this is

1
2  all speculation as to what was meant by what.  So I
3  continue to insist that this is a very weak case.
4         THE COURT:   Well, I have considered the evidence
5  offered by each side and the arguments that have been made.
6  I've considered the Pretrial Services report, the
7  indictment, the line sheets that were presented here today.
8  This is a presumption case, and particularly given the
9  defendant's extremely serious prior criminal conviction for
10 exactly the events, in combination with the other evidence,
11 I don't believe that he's overcome the presumption that
12 there's no combination of conditions that will ensure his
13 return to court.
14         This is a significant drug charge.  The evidence,
15 while might be open to other interpretation in terms of the
16 line sheets, we understand, of course, there's also
17 cooperator testimony or cooperator information about what's
18 actually going on here with the trips to Colombia.  The
19 prior conviction, which resulted in a ten-year sentence,
20 obviously extremely serious, shows that the defendant puts
21 his interests ahead of society.  Notwithstanding the
22 extensive ties to the community here in the Bronx, we've
23 obviously seen another personal tie to Colombia as well.
24         In light of these facts, I don't believe the
25 presumption had been overcome.  Accordingly, the defendant

is ordered detained as a danger to the community. The

Government has met its burden by clear and convincing

evidence that there's a serious risk that the defendant

will flee. Anything else from the Government?

          MR. JOHNSON-SKINNER:   No, Your Honor.

          THE COURT:   Defense counsel.

          MR. SUAREZ:   No, Your Honor.

          THE COURT:   All right, thank you everyone.

          MR. JOHNSON-SKINNER:   Thank you.

          (Whereupon the matter is adjourned.)

C E R T I F I C A T E

        I, Carole Ludwig, certify that the foregoing
transcript of proceedings in the case of United States v.
Kajtazi, Docket #16cr289, was prepared using digital
transcription software and is a true and accurate record of
the proceedings.




Signature_____

Date:    May 25, 2016